## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

NSAC, LLC,

                      Plaintiff,

v.                                        Case No. _____

THE SCHOOL BOARD OF ST. LUCIE
COUNTY, FLORIDA,

                      Defendant.

## COMPLAINT

Plaintiff NSAC, LLC ("NSAC"), by its undersigned counsel, hereby brings this Complaint ("Complaint") to remedy several breaches of contract by Defendant the School Board of St. Lucie County, Florida (the "Board").

## NATURE OF THE ACTION

1.      The Board holds two Federal Communications Commission ("FCC") licenses to use eight unique "channels" of radio frequency spectrum in the Fort Pierce, Florida area (the "Licenses"). These licensed channels are part of the Educational Broadband Service ("EBS"), which is a range of spectrum that the FCC historically has licensed only to educational and non-profit entities. Those entities, in turn, typically have leased the spectrum capacity authorized by their licenses to commercial entities.

2.      NSAC is a subsidiary of T-Mobile US, Inc. ("T-Mobile"), a company that provides wireless communications services. NSAC's business is to acquire and hold spectrum use rights for itself and other T-Mobile affiliates. Since 2008, the Board has leased to NSAC or its predecessor-in-interest the excess capacity on the licensed channels pursuant to a written agreement (the "Lease Agreement").

3.      The Lease Agreement guarantees that NSAC will make certain payments to the Board and, in exchange, the Board provides various rights to NSAC.  Those rights include the following:

    a.   NSAC's Exclusivity right, which prohibits the Board from assigning the Licenses to a third party unless certain criteria are met, including, without limitation, that the proposed buyer or assignee may not be a "Competing Entity," as that term is defined in the Lease Agreement.  *See* Ex. A §§ 3(a), 10(c).

    b.   NSAC's Right of First Refusal ("ROFR"), which provides that, in the event the Board receives an "acceptable *bona fide* offer" for the Licenses, NSAC has the right to match that offer and receive certain additional information concerning that offer.  *See* Ex. A § 3(b).

    c.   NSAC's Right to Participate, which provides that, in the event that the Board solicits bids, proposals, or offers for the sale or assignment of the Licenses, the Board must provide NSAC "with an opportunity no less favorable in timing or substance than the opportunity provided to any other entity" to, *inter alia*, "receive information" with respect to such bids, proposals, or offers, "discuss such information" with the Board, and "counter" such bids, proposals, or offers. *See* Ex. A § 3(f).

4.      The Board has breached each of these provisions of the Lease Agreement.

5.      In November 2021, the Board informed NSAC that it had received a purported offer to purchase the Licenses from a third-party competitor to NSAC, WCO Spectrum LLC ("WCO"), for $6,795,000.

6.      Three months later, in February 2022, the Board informed NSAC that it had received

a new purported, non-binding offer from WCO, this one for $7,550,000.  The Board characterized this offer as "*bona fide*" and informed NSAC that it intended to accept the new offer unless NSAC exercised its ROFR right within 30 days.  The Board also summarily asserted that WCO was not a Competing Entity and attached a conclusory declaration that purported to verify as much but contained no supporting evidence.

7.      In response, NSAC requested that the Board provide certain information and assurances due to NSAC under the Lease Agreement.  Among other things, NSAC requested that the Board provide information sufficient to establish that WCO's offer was *bona fide* and thus capable of being accepted, including information to substantiate its unsupported assertion that WCO is not a Competing Entity.  NSAC also requested that the Board provide information that NSAC is due under the Right to Participate provision, including all documents and communications exchanged between WCO and the Board concerning WCO's offers.

8.      NSAC also offered that the parties could enter a standstill agreement that would preserve the status quo by stipulating that:  (i) until the issues raised in NSAC's letter had been resolved, the time in which NSAC must decide whether to exercise its ROFR right would not start running; and (ii) in the interim, the Board would not proceed with any proposed sale or assignment of the Licenses.

9.      The Board refused to provide the requested information or to enter the proposed standstill agreement, and took the position that NSAC's ROFR right expires on March 26, 2022.

10.     The Board, as the party seeking to invoke the contractual exception to exclusivity, bears the burden of establishing that WCO's offer is *bona fide* and capable of being accepted, including but not limited to establishing that WCO is not a Competing Entity.

11.     The Board has not carried this burden.

12.     Accordingly, unless and until the Board establishes that the exception to exclusivity

applies, it should not be permitted to sell or assign the Licenses to WCO, or should be required to unwind any such transaction to the extent the Board already has purported to effect it.

13.     Additionally, it is critically important that the 30 days in which NSAC must decide whether to match an "acceptable *bona fide*" offer under the ROFR provision does not start running until the Board in fact has established that WCO's offer is *bona fide* and capable of being accepted. Otherwise, the Board could coerce NSAC into matching an invalid offer and obtain funds to which it was never entitled.

14.     Accordingly, because the Board has not established that WCO's non-binding offer is *bona fide* and capable of being accepted—including because it has not established that WCO is not a Competing Entity—NSAC also seeks a declaration that the 30-day period in which it must exercise its ROFR has not yet begun to run.

## PARTIES

15.     NSAC is a limited liability company organized under the laws of Delaware.  Its ultimate parent is T-Mobile.  NSAC's sole member is Clearwire XOHM LLC, a limited liability company organized under the laws of Delaware.  Clearwire XOHM LLC's sole member is Nextel West Corp., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, NSAC is a citizen of Delaware, Washington, and no other state.

16.     The Board is a public school system in St. Lucie County, Florida, with its main address at 9641 Brandywine Lane, Port St. Lucie, Florida 34986.  Accordingly, the Board is a citizen of Florida and no other state.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the

claims are between citizens of different states.  Plaintiff NSAC is a citizen of Delaware, Washington, and no other state.  Defendant the Board is a citizen of Florida and no other state.

18.     This Court has personal jurisdiction over the Board because it exists in Florida, its principal place of business is in Florida, and it committed the acts complained of in Florida.

19.     This District is a proper venue under 28 U.S.C. § 1391(b) because the Board resides in this District, a substantial part of the events giving rise to the claim occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

## FACTUAL BACKGROUND

**A.      The Licenses to the Fort Pierce Spectrum**

20.     The Board has long held two Licenses to use eight unique channels of radio-frequency spectrum in the Fort Pierce, Florida, area.  The channels are designated A1, A2, A3, and A4, under the FCC "call sign" WLX391; and B1, B2, B3, and B4, under the FCC call sign WLX392.

21.     The licensed channels are part of the EBS, which is a range of spectrum that the FCC historically has licensed to educational and/or non-profit organizations.

22.     There are 20 EBS channels in any particular geographic area.  They fall within the band of spectrum from 2496 to 2690 MHz, commonly referred to as the "2.5 GHz" spectrum band.

23.     Prior to April 2020, FCC rules permitted EBS licensees, like the Board, to lease all but five percent of their licensed spectrum to non-educational entities, like NSAC.  Nearly all of the 1,300 EBS licensees nationwide did so.  These leases took spectrum that otherwise would have gone unused, and used it to support modern high-speed broadband telecommunications services—such as the emerging 5G cellular service that T-Mobile affiliates provide in St. Lucie County.

**B.      The September 2008 Lease Agreement**

24.     On September 9, 2008, the Board and NSAC's predecessor-in-interest entered into a lease agreement for the spectrum capacity authorized by the Licenses, a copy of which is attached

hereto as Exhibit A.[1]  NSAC's predecessor-in-interest subsequently assigned its rights and obligations under the Lease Agreement to NSAC.  The Lease Agreement's term is through approximately 2038. The parties operated under the Lease Agreement for the first 13 years of its duration without incident.[2]

25.     Under the Lease Agreement, the Board grants NSAC the right to use the spectrum capacity authorized by the Licenses (subject to the FCC's mandate that the parties reserve five percent of the spectrum capacity for educational uses) in exchange for an initial fee and a monthly payment. The Lease Agreement also contains several other provisions that are central to this dispute.

26.     The Lease Agreement contains an Exclusivity provision that, as relevant here, prohibits the Board from "negotiat[ing] with or enter[ing] into any contract or agreement with any third party to lease, sell, assign, transfer or use any of the capacity of the Channels" "[e]xcept as otherwise permitted pursuant to Subsection 10(c)."  Ex. A § 3(a).

27.     Section 10(c), in turn, provides:

Subject to [NSAC]'s ROFR and FCC Rules, [the Board] may negotiate and enter into any contract to assign the Licenses to a third party provided that:

(i)     [the Board] provides [NSAC] at least thirty (30) days advance notice prior to entering into any agreement relating to any such proposed assignment;

(ii)    [the Board] agrees in writing to assign all its rights and obligations under this Agreement and such third party agrees in writing to assume all of [the Board]'s obligations hereunder and acknowledges all of [NSAC]'s rights hereunder, including [NSAC]'s ROFR (as it applies to any subsequent transfer);

(iii)   the assignment and assumption agreement is in a form reasonable acceptable to [NSAC];

(iv)    the assignee is not a Competing Entity (defined below); and

---

[1] NSAC has filed the Lease Agreement with minor redactions to prevent the disclosure of NSAC's confidential trade secret information contained in its EBS lease agreements.  *See* Ex. A § 14 ("CONFIDENTIALITY AND NON-DISCLOSURE").

[2] On February 8, 2011, the Board and NSAC's predecessor-in-interest executed an Addendum to the Lease Agreement, a copy of which is attached as Exhibit B.  On November 30, 2018, the Board and NSAC executed a First Amendment to the Lease Agreement, a copy of which is attached as Exhibit C.

(v)     upon closing of such assignment, [the Board] (assignor) provides notice of the closing of the assignment and a fully executed copy of the assignment and assumption agreement to [NSAC].

A "Competing Entity" is any party that (1) offers, provides or delivers a commercially available telecommunications service using EBS or BRS spectrum within the United States of America (a "Competing Service"), (2) owns (except a less than two and one-half percent (2½%) interest in a publicly traded company) any interest in any entity which provides a Competing Service, (3) has granted, or controls, is controlled by or is under common control with, a party that has granted, to any provider of a Competing Service a global or overarching agreement for the right, option, or preemptive right, to use or otherwise acquire all or any portion of the EBS or BRS spectrum that such party owns or subsequently acquires.

Ex. A § 10(c).

28.     The Lease Agreement also contains a ROFR provision that grants NSAC "the right to use, lease, or purchase . . . some or all of the Channels . . . by matching any acceptable *bona fide* offer received by [the Board] from a third party (the 'ROFR') during the Term."  Ex. A § 3(b).  The ROFR provision further provides:  "Within thirty (30) days following [the Board]'s determination to accept a *bona fide* third party offer (the 'Third Party Offer'), [the Board] will notify [NSAC] of any Third Party Offer, including (i) the identity of the offeror; (ii) the terms of the offer, and (iii) a true and correct copy of the operative agreement, letter of intent, term sheet or other similar definitive then-existing documentation relating to the offer."  *Id.*  NSAC then has thirty (30) days to notify the Board whether it will exercise its ROFR to purchase the Licenses.  *Id.*

29.     The Lease also grants NSAC a "Right to Participate."  *See* Ex. A § 3(f).  That provision states in relevant part:  "If [the Board] decides to solicit bids, proposals or offers for the sale, assignment, transfer or use of any part of the whole of the Channels . . . then *[the Board] will provide [NSAC] with an opportunity no less favorable in timing or substance than the opportunity provided to any other entity*: (i) to submit bids, proposals and offers for the Channels . . . ; (ii) to receive information with respect to such bids, proposals, offers and counters thereto; (iii) to discuss such information with [the Board]; (iv) to counter any such bids, proposals or offers; and (v) to be

provided with copies of all open bids, proposals, offers, counter-bids and counter-offers promptly after they are received by [the Board]." *Id.* (emphasis added).

**C.      The FCC Changes the Rules for Holding EBS Licenses**

30.      Prior to April 2020, FCC regulations allowed only educational or non-profit entities to hold EBS spectrum licenses.

31.      Effective April 27, 2020, however, the FCC eliminated the educational-use requirement for EBS licenses.  According to the FCC, this change was enacted because "technological changes over the last 30 years enable any educator with a broadband connection to access a myriad of educational resources."  Transforming the 2.5 GHz Band, 86 Fed. Reg. 10,839, 10,840 (2021). Hence, "[o]nly a handful of EBS licensees ha[d] deployed their own networks or use[d] their EBS licenses in a way that require[d] dedicated spectrum." *Id.*  Instead, most licensees "rel[ied] on lessees [such as NSAC] to deploy and operate broadband networks and use[d] the leases as a source for revenues or devices." *Id.*

32.      With EBS licenses now available to non-educational actors—and with 2.5 GHz spectrum being one of the most important components of the emerging 5G telecommunications technology—several new entities have entered the market for spectrum licenses, seeking to acquire such licenses for commercial gain.

33.      One such entity is Winnick & Company, which operates through a number of affiliates, including WCO.  WCO is a private company owned and controlled by billionaire Gary Winnick.  *See* About WCO Spectrum LLC, https://www.wcospectrum.com/about-wco-spectrum/ (last visited Mar. 25, 2022).  WCO describes itself as an investor in EBS spectrum licenses.

34.      Since the FCC rule change, WCO has sent dozens of institutions "Non-Binding Term Sheets" purporting to propose to purchase their EBS licenses, without regard for whether the terms of the underlying contracts permit such purchases.  *See, e.g.*, Ex. D (WCO Term Sheet to the Board).

**D.      WCO Makes Its First Non-Binding Offer to the Board**

35.      In 2021, WCO apparently made its first entreaty to the Board about a potential purchase of its Licenses.

36.      On November 19, 2021, the Board, through its outside counsel, Todd D. Gray, Esq., informed Heather Brown, Esq., in-house counsel for T-Mobile, that it had received an "unsolicited offer" to purchase the Licenses.  *See* Ex. E.  Mr. Gray stated that the Board "may be interested" in pursuing such a sale and inquired whether NSAC was interested in purchasing the Licenses.  *See* Ex. E.

37.      Later that day, Mr. Gray provided Ms. Brown and Tajit Mehta of T-Mobile with a copy of the purported "offer letter" the Board had received.  Ex. F.  The letter, which was one-page long and dated October 22, 2021, showed that the offeror was WCO and that the offer was for $6,795,000.  *See* Ex. G.

38.      In that letter, WCO stated that it is a "private investment firm focused on acquiring Educational Broadband Service . . . spectrum licenses" and that WCO's "principals . . . have sourced and deployed billions of dollars to fund transformative technologies and corporate innovation." Ex. G.

39.      Neither WCO's letter, nor Mr. Gray in his communications with NSAC, represented that WCO's October 22, 2021 offer was "*bona fide*."  Nor did either represent at that time that WCO was not a "Competing Entity."

**E.      WCO Makes a Second, Higher Non-Binding Offer to the Board**

40.      Three months later, on February 24, 2022, Mr. Gray notified Ms. Brown that the Board had received a new, higher non-binding offer from WCO, this one for $7,550,000.  *See* Ex. H.

41.      Mr. Gray told Ms. Brown that the Board intended to accept this $7,550,000 offer—which he notably did not describe as "unsolicited"—unless NSAC provided notice that it intended to

exercise the ROFR "within thirty (30) days," or by March 26, 2022.  *See* Ex. H.

42.     Mr. Gray also attached two documents to his February 24, 2022 correspondence to Ms. Brown.  First, he attached a copy of WCO's new purported offer letter, which was dated February 22, 2022 and included a proposed non-binding term sheet.  *See* Ex. D.  The term sheet purports to "summarize[] the basic terms and conditions pursuant to which WCO Spectrum, LLC (the 'Buyer') proposes to acquire . . . certain [EBS] licenses from the School Board of St. Lucie County, Florida." *See* Ex. D.

43.     The term sheet also emphasizes that it is for "DISCUSSION PURPOSES ONLY" and that it "do[es] not represent a binding offer, agreement, or commitment from the Buyer to acquire the EBS licenses."  *See* Ex. D.

44.     WCO's accompanying cover letter likewise underscores that it "is solely a non-binding offer and is not, and should not be, considered a legally binding indication or agreement in any matter."  *See* Ex. D.  In that letter, WCO also references a "Non-Disclosure Agreement" between the Board and WCO dated December 14, 2021.  *See* Ex. D.

45.     Second, Mr. Gray attached an "Affidavit of Carl Katerndahl" (the "Katerndahl Affidavit"), which Mr. Gray characterized as "attesting to the fact that WCO is not a Competing Entity" under Section 10(c) of the Lease.   *See* Ex. I.

46.     Specifically, the Katerndahl Affidavit, which is less than half a page long, purports to "verify" that (1) "WCO and its affiliates do not provide a telecommunications service using Educational Broadband Service (['']EBS') or Broadband Radio Service ('BRS') spectrum within the United States of America (a 'Competing Service')"; (2) WCO and its affiliates do not own an interest in any entity which provides a Competing Service"; and (3) "WCO is not affiliated with a party that has granted, to any provider of a Competing Service any right, option, or preemptive right, to use or otherwise acquire all or any portion of the EBS or BRS spectrum that WCO or such party owns or

subsequently acquires." Ex. I.   The affidavit provided no facts whatsoever to support Mr. Katerndahl's unadorned, self-serving assertions.

**F.      NSAC Unsuccessfully Seeks Information to Which It Is Entitled**

47.      On March 17, 2022, NSAC, through outside counsel, formally notified the Board that, *inter alia*, (1) it was in breach of Section 3(a) given that the Board had not established that WCO's $7,550,000 offer was *bona fide*, including but not limited to because it had not established that WCO is not a "Competing Entity"; and (2) it was in breach of Section 3(f) given that the Board had not provided NSAC with an opportunity no less favorable in timing or substance than the right provided to WCO to receive information under the Lease and discuss such information with the Board.  *See* Ex. J.

48.      In an effort to resolve those breaches, NSAC requested various information and assurances to which it is entitled under the Lease Agreement.  Specifically, it asked the Board to:

       a.      establish that WCO's offer is "*bona fide*" and thus capable of being accepted, and provide NSAC with a true and correct copy of "the operative agreement, letter of intent, term sheet, or other similar definitive then-existing documentation relating to the offer," as required under Section 3(b);

       b.      establish that WCO is not a Competing Entity, as required under Section 10(c)(iv);

       c.      provide NSAC with an assurance that WCO will "agree[] in writing to assume all of [the Board]'s obligations" under the Lease Agreement and "acknowledge[] all of" NSAC's rights thereunder, as required under Section 10(c)(ii);

       d.      provide NSAC with a proposed agreement—which the February 22, 2022 term sheet explicitly is not—sufficient to enable it to determine if such agreement is

"in a form reasonably acceptable" to NSAC, as required under Section 10(c)(iii); and

e.     provide NSAC with, *inter alia*, "information with respect to" any bids, proposals, offers, and counters thereto—including information concerning the reasons why WCO increased its offer—and permit NSAC to "discuss such information with [the Board]," as required under Section 3(f).

*See* Ex. J.

49.     These rights are critical not only because the requested information is important in its own right, but because it bears directly on whether NSAC will exercise the ROFR.

50.     NSAC's letter also included a list of questions intended to facilitate the exchange of information required by the Lease Agreement.  *See* Ex. J.

51.     In an effort to facilitate the exchange of this information without resorting to litigation, NSAC also requested that the Board enter a proposed Standstill Agreement that it attached to the letter.  *See* Ex. K.  The proposed agreement would have preserved the status quo by providing that, until the issues raised in the letter are resolved, the time period in which NSAC must exercise its ROFR will not begin running, if at all, and the Board will not proceed with any sale or assignment of the Licenses.  *See* Ex. K.

52.     On March 24, 2022, the Board refused to provide the requested information and refused to enter the proposed Standstill Agreement, taking the position that NSAC's ROFR right expires on March 26, 2022 and stating that, if NSAC did not exercise its ROFR by that date, the Board "will proceed with the sale of the licenses to WCO."  Ex. L.

53.     NSAC has done everything in its power to obtain the information to which it is entitled without resorting to litigation.  *See* Exs. J, K.  Those efforts uniformly have been unsuccessful.

54.     Now, as a last resort, NSAC brings this action based on the Board's breaches of the

Exclusivity provision in Section 3(a) and the Right to Participate provision in Section 3(f), and for a declaration that the Board has failed to provide the information needed to start the time period during which NSAC must exercise its ROFR under Section 3(b).

## CAUSES OF ACTION
### COUNT I
### (Breach of Contract – Exclusivity)

55.     NSAC repeats and realleges paragraphs 1 through 54 as if they were fully set forth herein.

56.     The Lease Agreement constitutes a valid and enforceable contract between the Board and NSAC.

57.     NSAC complied with all conditions precedent and fully performed its obligations under the Lease Agreement.

58.     The Board has breached Section 3(a) of the Lease Agreement.

59.     Section 3(a) provides that, "[e]xcept as otherwise permitted pursuant to Subsection 10(c), during the Term, Licensee will not negotiate with or enter into any contract or agreement with any third party to lease, sell, assign, transfer or use any of the capacity of the Channels."

60.     Section 10(c), in turn, permits the Board to "assign" the Licenses to a third party provided that certain criteria are met, including that the proposed assignee "is not a Competing Entity."

61.     Notably, Section 10(c) does not provide that the Board may assign the Licenses to a third party that *represents* or *states* that it is not a "Competing Entity"; the provision bars assignment to any third party that *is in fact* a "Competing Entity."

62.     As a matter of law, because Section 10(c) is an exception to the exclusivity requirement of Section 3(a), the Board bears the burden of demonstrating that the requirements of Section 10(c) are met.

63.     The Board has not carried that burden because it has not shown that WCO's offer is *bona fide* and thus capable of being accepted, which includes but is not limited to establishing that WCO is not a Competing Entity under Section 10(c).

64.     The only "support" the Board has provided for its assertion that WCO is not a Competing Entity is the Katerndahl Affidavit. That is entirely insufficient to carry the Board's burden.

65.     For one thing, the Katerndahl Affidavit provides zero factual support for its assertions, and merely purports to recite the elements of the Lease Agreement's definition of a "Competing Entity." *See* Ex. I.

66.     For another, the Katerndahl Affidavit does not even recite the definition's elements accurately. In particular, it purports to "verify" that "WCO is not affiliated with a party that has granted, to any provider of a Competing Service any right, option, or preemptive right, to use or otherwise acquire all or any portion of the EBS or BRS spectrum that WCO or such party owns or subsequently acquires." Ex. I. But that is not the relevant inquiry under the Lease Agreement. The Lease Agreement defines "Competing Entity," in relevant part, as follows:

> A "Competing Entity" is any party that . . . has granted, *or controls, is controlled by or is under common control with,* a party that has granted, to any provider of a Competing Service *a global or overarching agreement* for the right, option, or preemptive right, to use or otherwise acquire all or any portion of the EBS or BRS spectrum that such party owns or subsequently acquires.

Ex. A § 10(c) (emphases added).

67.     Put simply, even if the representations in the Katerndahl Affidavit were true (which is dubious), they would not establish that WCO is not a Competing Entity.

68.     Other than the unsupported Katerndahl Affidavit, the Board has provided no information to substantiate its assertion that WCO is not a Competing Entity.

69.     This failure is especially concerning given that NSAC has good reason to suspect that WCO is, in fact, a Competing Entity.

14

70.     WCO made a point of touting to the Board that it is a "private investment firm focused on acquiring Educational Broadband Service . . . spectrum licenses" and that WCO's "principals . . . have sourced and deployed billions of dollars to fund transformative technologies and corporate innovation." Ex. G.

71.     When NSAC has inquired into the basis for WCO's statements, it has been stonewalled by the Board.

72.     That is notable because it is clear—based on WCO having submitted multiple offers to the Board, and entering a December 14, 2021 Non-Disclosure Agreement with the Board—that the Board and WCO have had discussions with WCO about its offers, and it is inconceivable that the "Competing Entity" issue was not addressed during those discussions.

73.     Against this background, the Board has not carried its burden of establishing that WCO is not a Competing Entity.

74.     The Board also has not carried its burden with respect to Section 10(c)(ii).

75.     Under Section 10(c)(ii), the Board may proceed with an assignment of the Licenses to a third party only if the Board "agrees in writing to assign all of its rights and obligations under this Agreement and such third party agrees in writing to assume all of [the Board]'s obligations hereunder and acknowledges all of [NSAC]'s rights hereunder, including [NSAC]'s ROFR (as it applies to any subsequent transfer."

76.     As discussed above, the Board has not provided NSAC any assurance from WCO in writing that WCO will "assume all of [the Board]'s obligations hereunder and acknowledge[] all of [NSAC]'s rights hereunder."

77.     Because the Board seeks to assign the Licenses without having met its burden to show that the exception to exclusivity in Section 10(c) applies, and without providing the necessary assurance required under Section 10(c), it is in breach of Section 3(a).

78.     Consequently, the Court should enjoin the Board from proceeding with any sale, assignment, or other transfer of the License or its rights thereunder to WCO, or should unwind any such transaction that the Board and WCO already have purported to consummate.

WHEREFORE, NSAC respectfully asks the Court to:

a.     Order necessary and appropriate injunctive relief, including a permanent/final injunction preventing the Board from selling, transferring, or assigning the Licenses to WCO or any of its affiliates, or unwinding any such transaction to the extent the Board already has purported to effect it;

b.     Award NSAC compensatory damages in an amount exceeding $75,000;

c.     Award NSAC all costs and interest allowed by law;

d.     Pursuant to Section 22(f) of the Lease Agreement, award NSAC all attorney's fees and expenses that relate to its pursuit of this litigation and the preceding dealings with the Board and WCO;

e.     Award NSAC such other relief as the Court deems just and reasonable; and

f.     Provide NSAC with the right to amend this Complaint in the event the Court determines NSAC has failed to adequately plead the foregoing claim against the Board or as other events may warrant.

## COUNT II
### (Breach of Contract – Right to Participate)

79.     NSAC repeats and realleges paragraphs 1 through 54 as if they were fully set forth herein.

80.     The Lease Agreement constitutes a valid and enforceable contract between the Board and NSAC.

81.     NSAC complied with all conditions precedent and fully performed its obligations under the Lease Agreement.

82.     The Board breached Section 3(f) of the Lease Agreement.

83.     That section provides that, "[i]f [the Board] decides to solicit bids, proposals or offers for the sale, assignment, transfer or use of any part of the whole of the Channels . . . then [the Board] will provide [NSAC] with an opportunity no less favorable in timing or substance than the opportunity provided to any other entity: (i) to submit bids, proposals and offers for the Channels . . . ; (ii) to receive information with respect to such bids, proposals, offers and counters thereto; (iii) to discuss such information with [the Board]; (iv) to counter any such bids, proposals or offers; and (v) to be provided with copies of all open bids, proposals, offers, counter-bids and counter-offers promptly after they are received by [the Board]."

84.     Upon information and belief, the Board solicited bids, proposals, and/or offers from WCO for the sale or assignment of the Licenses, including but not limited to WCO's February 22, 2022 non-binding "offer" of $7,550,000.  That offer was WCO's second purported offer and represented a $755,000 increase over WCO's earlier purported offer of October 22, 2021.  It is flatly implausible that WCO decided to increase its offer without engaging in communications with the Board.  Further, and notably, while the Board described WCO's first offer as "unsolicited," it did not do the same for WCO's February 22, 2022 offer.

85.     In addition, the Board and WCO apparently entered into a December 14, 2021 Non-Disclosure Agreement.  *See* Ex. D.  The Board's execution of such an agreement with WCO confirms that the Board has deprived NSAC of its right to an "an opportunity no less favorable in timing or substance than the opportunity provided to any other entity" to, *inter alia*, "receive information with respect to such bids, proposals, offers and counters thereto."

86.     The Board has refused to share the required information concerning either of WCO's two offers, including without limitation any information about the Board's communications with WCO that resulted in WCO subsequently making a higher offer, copies of all documents exchanged

between WCO and the Board concerning the offers, and copies of the December 14, 2021 Non-Disclosure Agreement and any other agreements between the Board and WCO.

87.   The Board has thus failed to provide NSAC with the same opportunity as WCO to receive information with respect to WCO's offers.  This breach has further deprived NSAC of its right to discuss such information with the Board and to "counter" any offers received by the Board.

WHEREFORE, NSAC respectfully asks the Court to:

a.   Order specific performance by the Board of Section 3(f) of the Lease Agreement, by mandating that the Board share all information requested by NSAC concerning, *inter alia*, WCO's October 22, 2021 non-binding offer, WCO's February 22, 2022 non-binding offer and the term sheet attached thereto, and all circumstances surrounding these offers.

b.   Award NSAC compensatory damages in an amount exceeding $75,000;

c.   Award NSAC all costs and interest allowed by law;

d.   Pursuant to Section 22(f) of the Lease Agreement, award NSAC all attorney's fees and expenses that relate to its pursuit of this litigation and the preceding dealings with the Board and WCO;

e.   Award NSAC such other relief as the Court deems just and reasonable; and

f.   Provide NSAC with the right to amend this Complaint in the event the Court determines NSAC has failed to adequately plead the foregoing claim against the Board or as other events may warrant.

## COUNT III
### (Declaratory Judgment – ROFR)

88.     NSAC repeats and realleges paragraphs 1 through 54 as if they were fully set forth herein.

89.     The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between NSAC and the Board regarding the parties' rights and obligations under the Lease Agreement.

90.     Under Section 3(b) of the Lease Agreement, NSAC's time for exercising the ROFR is triggered by the Board's "determination to accept a *bona fide* third party offer."

91.     Because Section 10(c) of the Lease Agreement prohibits the assignment of the License to a Competing Entity, an offer from a Competing Entity is not a *bona fide* offer for purposes of Section 3(b).  Nor is it an offer that is capable of being "accept[ed]."

92.     As a matter of law and equity, the time period during which NSAC must decide whether to exercise its ROFR does not begin running until the Board has established that the third party offer is *bona fide* and can be accepted, which includes but is not limited to until the Board has established that WCO is not a Competing Entity.

93.     Otherwise, the Board could obtain an invalid offer—the invalidity of which is concealed—and compel NSAC to match it or risk losing its right to do so.  If NSAC chose to match it, then the Board would have coerced a significant sum of money ($7.55 million in this case) that NSAC was never required to pay.

94.     Such a result is precluded by the Lease Agreement and governing equitable principles.

WHEREFORE, NSAC respectfully asks the Court to:

a.     Issue a declaratory judgment that the time period during which NSAC must notify the Board whether it is exercising its ROFR will not start running, if at all, until the Court issues a final

ruling determining whether the Board has established that WCO's offer is *bona fide*, which includes but is not limited to until the Board has established that WCO is not a Competing Entity.

b.      Award NSAC all costs and interest allowed by law;

c.      Pursuant to Section 22(f) of the Lease Agreement, award NSAC all attorney's fees and expenses that relate to its pursuit of this litigation and the preceding dealings with the Board and WCO;

d.      Award NSAC such other relief as the Court deems just and reasonable; and

e.      Provide NSAC with the right to amend this Complaint in the event the Court determines NSAC has failed to adequately plead the foregoing claim against the Board or as other events may warrant.

## PRAYER FOR RELIEF

WHEREFORE, NSAC respectfully asks the Court to:

a.      Order necessary and appropriate injunctive relief, including a permanent/final injunction preventing the Board from selling, transferring, or assigning the Licenses to WCO or any of its affiliates, or unwinding any such transaction to the extent the Board already has purported to effect it;

b.      Order specific performance by the Board of Section 3(f) of the Lease Agreement, by mandating that the Board share all information requested by NSAC concerning, *inter alia*, WCO's October 22, 2021 non-binding offer, WCO's February 22, 2022 non-binding offer and the term sheet attached thereto, and all circumstances surrounding these offers;

c.      Issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that the time period during which NSAC must notify the Board whether it is exercising its ROFR will not start running, if at all, until the Court issues a final ruling determining whether the Board has established that WCO's

offer is *bona fide*, which includes but is not limited to until the Board has established that WCO is not a Competing Entity;

     d.     Award NSAC compensatory damages in an amount exceeding $75,000, including those incurred in having to enforce its rights under the Lease Agreement;

     e.     Pursuant to Section 19(b) of the Lease Agreement, order the Board to indemnify and hold NSAC harmless from and against any and all liabilities, losses, damages and costs, including reasonable attorneys' fees, resulting from, arising out of, or in any way connected with the Board's breach of the Lease Agreement.

     f.     Award NSAC all costs and interest allowed by law;

     g.     Pursuant to Section 22(f) of the Lease Agreement, award NSAC all attorney's fees and expenses that relate to its pursuit of this litigation and the preceding dealings with the Board and WCO;

     h.     Award NSAC such other relief as the Court deems just and reasonable; and

     i.     Provide NSAC with the right to amend this Complaint in the event the Court determines NSAC has failed to adequately plead the foregoing claim against the Board or as other events may warrant.

Dated: March 25, 2022               Respectfully submitted,

                                /s/ *Michael A. Abel*
                                Michael A. Abel
                                Florida Bar No. 0075078
                                mabel@abelbeanlaw.com
                                ABEL BEAN LAW
                                100 N. Laura Street, Suite 501
                                Jacksonville, FL 32202
                                Telephone: (904) 944-4100
                                Facsimile: (904) 944-4122

WILLIAMS & CONNOLLY LLP
Kenneth J. Brown*
kbrown@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
William I. Stewart*
wstewart@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*application for admission *pro hac vice*
Forthcoming under Rule 4, Rules
Governing the Admission, Practice, Peer
Review, and Discipline Of Attorneys

*Attorneys for NSAC, LLC*